RENDERED: SEPTEMBER 24, 2015
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000311-MR

DEREK EARLY                                          APPELLANT

V.
             ON APPEAL FROM MCCRACKEN CIRCUIT COURT
             HONORABLE CRAIG Z. CLYMER, JUDGE
             NO. 13-CR-00150-002

COMMONWEALTH OF KENTUCKY                        APPELLEE

## OPINION OF THE COURT BY JUSTICE NOBLE

## <u>AFFIRMING</u>

Appellant, Derek Early, secured and later sold five forged prescriptions for a controlled substance. He was convicted of five counts of trafficking in prescription blanks and being a first-degree persistent felony offender. Following the jury's recommendation, the trial court sentenced him to twenty years' imprisonment. In this matter-of-right appeal, Early claims the trial court erred by (1) denying his motion for a directed verdict, and (2) violating the bar on double jeopardy.

Finding no reversible error, his convictions are affirmed.

## I. BACKGROUND

Leah Renee Herring was a dental assistant at Ciampa Oral Surgery and, due to her work in post-surgery recovery, she had access to prescription blanks that were pre-signed by her employer, Dr. Ciampa. Herring testified that she

and her fellow dental assistants used the pre-signed prescription blanks on a daily basis for prescribing pain medication to authorized patients recovering from oral and maxillofacial surgery.

On January 4, 2013, Derek Early called Herring, a long-time friend. Aware of her profession, Early complained that he was "hurting" and asked her to write him a prescription. Although Herring initially declined, she eventually agreed and met Early at a predetermined location near Dr. Ciampa's office. Upon their meeting, Early pulled his vehicle next to Herring's and instructed her to write the prescription for Barbara Miller. When Herring questioned his request, Early explained that he wanted the prescription in a different name to avoid trouble.

Herring complied and filled out one of Dr. Ciampa's pre-signed prescription blanks for Lortab under the name of a fictitious patient, Barbara Miller. Herring testified that she did not know anyone named Barbara Miller and that she was aware that Barbara Miller was not one of Dr. Ciampa's patients. She also admitted at trial that the prescription was a forgery.

On January 7, 2013, Early called Jarrod Pierce, a former co-worker and known narcotics addict. Early informed Pierce that he had certain connections at a doctor's office and could get Pierce a prescription for pain pills. Pierce said he was interested and asked Early to put the prescription in the name of his ex-girlfriend, Kari Leigh, believing Leigh's insurance might cover the cost of the prescription.

On that same day, Early reached out to Gary McDonald, his friend since childhood. Early asked McDonald if he, or anyone he knew, was interested in

buying Lortab prescriptions. McDonald was in a car with his girlfriend's brother, Tommy Amis, who had a history of prescription-drug abuse. McDonald asked Amis if he wanted a prescription, Amis said yes, and McDonald relayed Amis' full name and date of birth to Early.

Early contacted Herring again and asked for three additional Lortab prescriptions. They met at the same location near the surgeon's office, and Early instructed Herring to write specific names on each of the three prescriptions. Herring then filled out three pre-signed prescriptions, each bearing a different name: Kari Leigh, Tommy Amis, and Brittany Harris.

Later that day, Early met Pierce and, in exchange for $60, gave him the prescription for Kari Leigh. McDonald and Amis also drove to meet Early. Upon their arrival, McDonald got into Early's vehicle and purchased the Tommy Amis and Brittany Harris prescriptions for $200. McDonald returned to his car where Amis was still waiting. Amis noticed that McDonald had two prescriptions. Amis took the prescription bearing his own name but declined the prescription for Brittany Harris.

On January 18, 2013, McDonald called Early and requested another prescription, this time in his own name. Early confirmed the order, contacted Herring, and asked her for another prescription. Herring met Early and filled out a prescription with Gary McDonald's name, but before giving it to Early, she told him that she would not write him any more prescriptions. Later, McDonald gave Early $100 for the prescription bearing his name and took it to a pharmacy.

A few days later, Kari Leigh was on her pharmacy's website, ordering a refill for her son's medication, when she noticed an unfamiliar prescription for Lortab in her prescription history. Her subsequent conversations with the pharmacy and Detective John Toliver led to a full investigation of the forged prescription. The investigation led Toliver and the police to Dr. Ciampa's office, which, in turn, led them to Herring and, ultimately, to Early.

A grand jury indicted Early, Herring, Pierce, McDonald, and Amis. The latter four pleaded guilty to various criminal counts, and all four testified at Early's trial. The jury convicted Early of five counts of trafficking in prescription blanks, KRS 218A.286(3), recommending five years on each count to run concurrently. The jury also found that he was a persistent felony offender in the first degree, KRS 532.080, and recommended the maximum punishment. His ultimate sentence was a PFO-enhanced twenty years.

Early now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). Additional facts will be developed as needed below.

## II. ANALYSIS

### A. The trial court did not err in denying Early's motion for a directed verdict.

Early argues the trial court violated his right to due process of law when it denied his motion for a directed verdict at the close of the Commonwealth's case. He offers two reasons in support of this claim: (1) that the Commonwealth failed to produce sufficient evidence proving the prescriptions were "forged," and (2) that there was no evidence Early possessed the Barbara Miller prescription with the intent to sell it to another person.

4

Before turning to the merits of these claims, however, there is a question whether this issue was properly preserved for appellate review. The Commonwealth argues that Early's motion for a directed verdict failed to meet the specificity requirement, Civil Rule 50.01, and that at the close of all evidence, he failed to renew his motion for a directed verdict. *See Commonwealth v. Jones*, 283 S.W.3d 665, 669 (Ky. 2009) ("to preserve an error based upon the insufficiency of the evidence the defendant ... must renew his motion at the close of all evidence").

Early maintains that his initial motion for a directed verdict was more than a "generalized motion" and, although the video record contains no indication of renewal, he asserts that the Court should assume he renewed such motion during an unrecorded discussion regarding jury instructions. Believing the denial resulted in manifest injustice, Early alternatively requests that we review this issue under the palpable error standard set forth in Criminal Rule 10.26.

For sufficient preservation on appeal, a motion "must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove." *Jones*, 283 S.W.3d at 669. Insufficiently specific motions, such as moving summarily for a directed verdict or making a general assertion of insufficient evidence, are not enough to satisfy the specificity requirement. *Potts v. Commonwealth*, 172 S.W.3d 345, 348 (Ky. 2005). Moreover, even the most specific motion for a directed verdict that is made at the close of the Commonwealth's case "but not renewed at the close of

5

all evidence ... is insufficient to preserve an error based on insufficiency of the evidence." *Schoenbachler v. Commonwealth,* 95 S.W.3d 830, 836 (Ky. 2003).

Early's motion for a directed verdict contained only vague assertions that the evidence was insufficient. In making his motion, Early stated:

> For the record, I want to make a motion for directed verdict. I think that although there's been some testimony about my client being involved, none of the documentary evidence in any way points directly to him. There was no indication that he changed or wrote on or did anything other than we've got some testimony from people who were trying to get themselves arguably out of trouble. So for the record, I would like to ask for a directed verdict.

This motion excludes any reference to a specific count or challenge to a specific element of the alleged crime. Moreover, it is more a challenge to the credibility of the Commonwealth's proof than its existence, since it alleges that the Commonwealth's proof consists only of the testimony of self-interested witnesses, which is not a proper ground for a directed verdict. Therefore, the motion lacked the particularity necessary to allow the trial court "the opportunity to pass on the issue in light of all the evidence." *Baker v. Commonwealth,* 973 S.W.2d 54, 55 (Ky. 1998).

Furthermore, Early failed to renew his motion for a directed verdict. At the close of all evidence, the trial court asked if there was any more proof. Early responded, "No, your honor," and the jury was released for the day. The parties discussed amending the jury instructions, agreed to examine the instructions later that evening, and the trial court turned off the video recording equipment. No renewal of the motion was made on the record.

Early argues that this Court should assume he renewed his motion for a directed verdict when the parties reconvened to discuss jury instructions "given

that this would have been the first time he would have been given to do so." Such an assumption is hard to justify given that the most opportune moment to renew a motion for a directed verdict is immediately at the close of all proof, rather than some later time when instructions are discussed. And Early failed to take advantage of that opportunity here.

More importantly, it is an appellant's burden to present a complete record and to establish that an error is preserved for our review. *Bingham v. Davis*, 444 S.W.2d 123, 124 (Ky. 1969). We acknowledge that litigants have little control over recording equipment during trial and that various inconsistencies may occur. However, when issues arise concerning the completeness and accuracy of the record, parties are not without recourse. They are specifically allowed to submit narrative supplements where there are gaps in the record. CR 75.13. Early made no attempt to cure the record in this manner. In fact, he has not even alleged that the motion in question was actually made, only that there is a time during the trial when it was most likely made. That is insufficient to preserve this claim for ordinary appellate review. This Court will not assume a motion was made where there is no evidence that it was.

Although the issue was insufficiently raised and improperly preserved for our review, Early requests that the Court undertake a palpable error analysis. Under Criminal Rule 10.26, an unpreserved error is palpable if it "affected the defendant's substantial rights and resulted in manifest injustice." *Barker v. Commonwealth,* 341 S.W.3d 112, 114 (Ky. 2011) (citing *Commonwealth v. Pace,* 82 S.W.3d 894 (Ky. 2002)). The Court will grant relief only if the error so

7

seriously affected the fairness and integrity of the proceeding as to be "shocking or jurisprudentially intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

As for the merits of Early's claim, when evaluating a motion for a directed verdict on appeal, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)). In that review, the Court draws all fair and reasonable inferences in favor of the Commonwealth and assumes that the Commonwealth's evidence is true. *Id.*

Ultimately, even if we disregard preservation and review the issue under the palpable error standard, it is evident that the trial court did not err in denying Early's motion for a directed verdict. Early's arguments are each discussed in turn.

### 1. The Commonwealth presented sufficient evidence for a reasonable jury to find that the prescriptions constituted forgeries.

Early contends that he was entitled to a directed verdict acquitting him on all counts because there is a lack of evidence showing the Lortab prescriptions were "forged." First, he claims that since he never wrote on the prescriptions or personally altered them in any way, they were not forgeries. Second, he claims that Herring's actions did not amount to forgery because she simply abused her authority when completing prescriptions for non-patients.

Early's first claim is grounded in a misunderstanding of the relevant statute. A person is guilty of trafficking in prescription blanks when he

8

"knowingly and unlawfully traffics in a prescription blank or a forged prescription for a controlled substance." KRS 218A.286(3). The jury instructions aptly defined *traffic* as "to sell or transfer or possess with intent to sell," which is consistent with the relevant language in the KRS Chapter 218A definition. *See* KRS 218A.010(49). Thus, Early's convictions under KRS 218A.286(3) simply required him to knowingly possess the forged prescriptions with the intent to sell them. His nonparticipation in the act of forgery is immaterial.

Early next contends that Herring did not forge the Lortab prescriptions but, rather, that she merely exceeded the scope of her authority. He points to the absence of a definition for *forged* in the jury instructions and argues that, had the jury been given the *Black's Law Dictionary* definition, they would have found the prescriptions were not false or altered documents.[1] Early supplies the following *forgery* definition:

1. The act of fraudulently making a false document or altering a real one to be used as if genuine.
2. A false or altered document made to look genuine by someone with the intent to deceive.
3. Under the Model Penal Code, the act of fraudulently altering, authenticating, issuing, or transferring a writing without appropriate authorization.

*Black's Law Dictionary* (7th ed. 2010).

Even if this definition presents a proper definition of *forged* as used in the statute, Early was properly convicted under it. While it may be true that

---

[1] Early does not claim an error in the jury instructions (though he implies one). Instead, he offers the forgery definition to show that a reasonable, properly instructed jury would not have convicted him under the statute.

Dr. Ciampa pre-signed prescription blanks for his dental assistants' use—a practice this Court in no way condones—it is utterly incorrect to assert that Herring's actions constituted anything less than forgery. Herring testified that she *forged* the prescriptions. She pleaded guilty to *forging* prescriptions. Herring also testified that Early supplied her with names of individuals that he knew were not patients of Dr. Ciampa. Herring's writing altered the prescription blanks so as to appear genuine, deceived pharmacists into believing the prescriptions' authenticity, and did so without any form of actual authorization.

Early argues that by Dr. Ciampa providing Herring with access to pre-signed prescription blanks, Herring had authority to prescribe medication. However, his argument improperly conflates the notion of "apparent authority" with that of actual authority. But "apparent authority is different from actual or implied authority." *Mark D. Dean, P.S.C. v. Commonwealth Bank & Trust Co.*, 434 S.W.3d 489, 499 (Ky. 2014). "Apparent authority ... is not actual authority but is the authority the agent is held out by the principal as possessing." *Id.* (quoting *Mill St. Church of Christ v. Hogan,* 785 S.W.2d 263, 267 (Ky. App. 1990)) (ellipsis in original). Therefore, while Herring's *apparent authority* to prescribe controlled substances might, for example, shield a pharmacist from liability for filling a forged prescription, it will not defend Early from knowingly possessing forged prescriptions with the intent to sell them, just as it would not have shielded Herring from liability for dealing in forgeries (and, indeed, it did not, as she was convicted).

Even assuming the jury instructions had included Early's proffered definition, Herring's behavior reasonably constituted forgery under any of the three interpretations from *Black's Law Dictionary*. Nevertheless, we agree with the Commonwealth that a generic meaning of the term *forgery*—"a document that is not what it purports to be"—was not beyond the comprehension of an average juror and would adequately enable a jury in this case to decide whether the prescriptions were legitimate or fabricated. A reasonable jury could have found that the prescriptions in this case were forged.

### 2. There was sufficient evidence for a reasonable jury to infer that Early possessed the Barbara Miller prescription with the intent to sell it to another.

Early next argues that he was entitled to a directed verdict for his conviction associated with the Barbara Miller prescription because the Commonwealth failed to prove that he possessed the prescription with the intent to sell it. He asserts that, because the Commonwealth did not present a witness to testify that they obtained the Barbara Miller prescription from Early, it is not unreasonable to conclude that he filled it for his personal use.

To reiterate, this is not a preserved issue because Early's only motion for a directed verdict did not present this claim to the trial court and he failed to renew any motion at the close of all proof. Regardless, even under palpable-error analysis, the record reveals that Early was not entitled to a directed verdict. There was sufficient circumstantial evidence for a reasonable jury to infer that, even if Early did not sell the Barbara Miller prescription, he still possessed it with the intent to do so.

11

We have consistently held that circumstantial evidence is enough to prove any element of a crime, including intent, and to sustain a conviction for an offense involving a controlled substance. *See Jones v. Commonwealth*, 331 S.W.3d 249, 253 (Ky. 2011). Although circumstantial evidence "must do more than point the finger of suspicion," the Commonwealth is not required to render all other inferences unreasonable. *Rogers v. Commonwealth*, 315 S.W.3d 303, 311 (Ky. 2010) (citing *Davis v. Commonwealth*, 795 S.W.2d 942, 945 (Ky. 1990)).

In this case, the Commonwealth presented evidence that Early acquired five prescriptions for the same Schedule II controlled substance, Lortab, with each written for a different unauthorized individual. Testimony also showed that Early sold four of those prescriptions to various people. During his testimony, Early explicitly denied using drugs. Even assuming the Commonwealth failed to cast sufficient doubt on the inference that Early procured the Barbara Miller prescription for himself, Early's subsequent repudiation of drug use cured any such deficiency in the Commonwealth's case. *See Lyon v. Prater*, 351 S.W.2d 173 (Ky. 1961) ("[D]efendant by his subsequent testimony has supplied the omission in the plaintiff's case.").

Collectively, the circumstances in this case show that Early was not entitled to a directed verdict because a jury could reasonably infer Early's intent to sell the Barbara Miller prescription from his sale of the four additional Lortab prescriptions. That proved he possessed the prescription with the intent to sell it, which is sufficient for a trafficking conviction.

**B. The separate trafficking convictions for each forged prescription did not violate Early's double jeopardy rights.**

Early's second claim concerns whether his multiple convictions for trafficking in prescription blanks violated double jeopardy when multiple forged Lortab prescriptions passed to one individual during a single transaction. Early argues that his second transaction with Herring, during which she gave him three forged prescriptions at once, constituted a single offense under KRS 218A.286(3) and could support only one conviction. The Commonwealth accurately dismantled Early's argument by clarifying that the necessary elements of his crime are "possession with knowledge" and "intent to sell." The manner in which he acquired the forged prescriptions is irrelevant, and simply does not control the number of offenses committed. The focus is on Early's actions, not those of Herring.

Nevertheless, the Commonwealth acknowledged—before ultimately negating—a potential double jeopardy issue separate from, but related to, Early's claim. Although Herring's transfer to Early is extraneous, Early's simultaneous sale of two forged prescriptions to McDonald merits further analysis given his separate convictions for each prescription. In reviewing the issue, the Court's decision relies predominantly on the precise language of KRS 218A.286(3) and our consistent approach to statutory interpretation in comparable cases.

Initially, we note that this issue is unpreserved. However, we will review for palpable error, as we have held that an appellant's failure to present a double-jeopardy argument to the trial court should not result in allowing a

13

conviction that violates double jeopardy to stand. *See Beaty v. Commonwealth,* 125 S.W.3d 196, 210 (Ky. 2003). Ordinarily, double-jeopardy claims are resolved by applying the *Blockburger* test. *See Commonwealth v. Burge,* 947 S.W.2d 805, 811 (Ky. 1996) (adopting the "same elements" test from *Blockburger v. United States,* 284 U.S. 299 (1932)).

But KRS 505.020 also bars conviction for multiple offenses arising from a single course of conduct when the offense is designed to prohibit a continuing course of conduct, as opposed to prohibiting separate and distinct offenses. *See* KRS 505.020(1)(c) ("[A defendant] may not ... be convicted of more than one (1) offense when ... [t]he offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses."). Under this provision, whether separate and distinct offenses arise from a particular course of conduct "depends on how a legislature has defined the allowable unit of prosecution." *Williams v. Commonwealth,* 178 S.W.3d 491, 495 (Ky. 2005).

When interpreting the elements of an offense, a court must "accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Bailey v. Reeves,* 662 S.W.2d 832, 834 (Ky. 1984) (citing *Dep't of Revenue v. Greyhound Corp.,* 321 S.W.2d 60 (Ky. 1959)). This Court has consistently interpreted other statutes and situations to mean that a series of readily distinguishable acts is not a course of conduct for double-jeopardy purposes. *See Welborn v. Commonwealth,* 157 S.W.3d 608, 612 (Ky. 2005) (upholding multiple convictions for repeated shots fired into one

14

police officer because each shot was a separate and distinct offense); *see also Commonwealth v. Bass*, 777 S.W.2d 916, 918 (Ky. 1989) (holding statute permitted charging *each* fraudulent claim over $100 as a separate felony).

In *Williams v. Commonwealth*, 178 S.W.3d at 493, a stepfather's conviction of multiple instances of the offense of use of a minor in a sexual performance pertained to each of multiple digital images that depicted his naked eight-year-old stepdaughter, which he captured in quick succession while the girl was showering. The relevant statutes define "sexual performance" as "*any* performance *or part* thereof which includes sexual conduct by a minor" and specified that a "[p]erformance" included "*any* play, motion picture, *photograph* or dance." *Id.* at 495 (quoting KRS 531.300(5)–(6)). Affirming separate counts, this Court held that "[t]he singular form of 'photograph' read in conjunction with the term 'any' clearly indicates that the Legislature intended prosecution for each differing photograph." *Id.*

The following year, in an identically named case, a doctor appealed his conviction of four counts of unlawfully prescribing a controlled substance. *Williams v. Commonwealth*, 213 S.W.3d 671, 673 (Ky. 2006). He argued that the four counts, each based on a separate unlawful prescription, should have merged into only two counts because he only engaged in two transactions. Specifically, on one occasion he gave a patient two prescriptions; and on another occasion, he gave a different patient two other prescriptions. *Id.* at 684–85. Rejecting the doctor's argument, this Court relied on the plain language of the statute, KRS 218A.1404(3), which defines "prescription" as "a written, electronic, or oral order for a drug or medicine." *Id.* The Court

15

interpreted the statute to mean that "each dispensation, prescription, distribution, or administration of any controlled substance in violation of the law is a specific period of conduct constituting a separate offense." *Id.*

Here, KRS 218A.286(3) prohibits trafficking in "a prescription blank" or "a forged prescription for a controlled substance." The legislature's use of the singular "*a* forged prescription" demonstrates its intention to punish the trafficking of each forged prescription as a separate and distinct trafficking offense. Moreover, when it intends to bar a continuing course of conduct, the legislature has consistently drafted criminal statutes to specify certain acts or quantities that may be included in a singular crime. *See, e.g.,* KRS 218A.1412(2) (specifying that amounts may be reached over a series of transactions); KRS 218A.1412; KRS 218A.1413; KRS 218A.1414 (stipulating specific quantities "or more," and "any quantity"). No such inclusive language appears in KRS 218A.286(3).

Early contends that *Commonwealth v. Grubb,* 862 S.W.2d 883 (Ky. 1993), forbids punishing a single criminal episode as multiple offenses. Admittedly, in *Grubb* this Court held that "[a] single sales transaction between the same principals at the same time and place which violates a single statutory provision does not justify conviction or a sentence for separate crimes." *Id.* at 884. However, Early's reliance on *Grubb* is misplaced. Grubb was convicted of trafficking in two controlled substances, not forged prescriptions, and the decision primarily relied on the "single impulse" test established in *Ingram v. Commonwealth,* which was later overruled in *Commonwealth v. Burge,* 947 S.W.2d at 811, in favor of the *Blockburger* test and KRS 505.020 analysis.

16

Nevertheless, even *Grubb* recognized that "[a] single act, under circumstances not found herein, could, however, threaten compound consequences." *Grubb*, 862 S.W.2d at 885.

Finally, contrary to Early's insistence, it would be inappropriate for the Court to apply the rule of lenity in this case because to do so would "undercut [the] unambiguous legislative design" of KRS 218A.286(3). *See Saxton v. Commonwealth*, 315 S.W.3d 293, 296 (Ky. 2010) (citing *United States v. Holland*, 810 F.2d 1215, 1222–23 (D.C. Cir. 1987)). The statute clearly defines a trafficking offense as relating to a prescription. Early's multiple convictions therefore did not violate the bar on double jeopardy.

### III. CONCLUSION

For the aforementioned reasons, Early's convictions are affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Roy Alyette Durham II
Assistant Public Advocate
Department of Public Advocacy
200 Fair Oaks Lane, Suite 500
Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Nathan Todd Kolb
Office of the Attorney General
Assistant Attorney General
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204

17